UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF CHRISTOPHER A. CHAMPINE
BY SPECIAL ADMINISTRATOR RICHARD COAD,

    *Plaintiff,*

    *v.*                              Case No: 1:23-cv-1392

BROWN COUNTY,
LARRY MALCOMSON, SCOTT BRISBANE,
HEIDI MICHEL, JOHN MITCHELL, JAMIE RHODE,
ERIC FROST, MICHAEL HALASI, PHILLIP STEFFEN,
MONA VICKMAN-KING, KURT VOSTER,
AL KRINGS, ROB WEED, GREG ENGLES,
KRISTY JOLLY, JEFFREY MEKASH, ZACHARY BERGH
WELLPATH, LLC,
CORRECT CARE SOLUTIONS, LLC,
CORRECTIONAL HEALTHCARE COMPANIES, INC.,
CORRECTIONAL HEALTHCARE COMPANIES, LLC,
JEAN SHORT, JESSICA JONES, AVA GONZALES,
AMANDA ZWIERS, DIANE JENSEN, JAMIE KUEHN,
EMILY BLOZINSKI, JESSICA DENISSEN,
LEEANN SULLIVAN, ATALIE PRZYBELSKI,
CYNTHIA DERY, MEGAN WEBER, MICHELLE WILKE,
SYNTHIA PETERSON, ADEYEMI FATOKI,
AND BABATUNDE OKULEYE,

    *Defendants.*

---

## FIRST AMENDED COMPLAINT

---

The Estate of Christopher A. Champine, by its attorneys, Strang Bradley, LLC, for its complaint against Defendants, states:

## INTRODUCTION

1.      This is a civil rights action brought by the Estate of Christopher A. Champine for damages under 42 U.S.C. § 1983. Christopher A. Champine ("Christopher"), died on December 16, 2017, as a result of injuries from hanging himself while being held in custody at the Brown County Jail in Brown County, Wisconsin.

2.      In 2016 and 2017, the Brown County Jail repeatedly failed to conduct medical and mental health evaluations of incoming inmates within 14 days as required by Wisconsin law, categorically cut off inmates from their prescription psychotropic medications cold turkey upon being booked into the Brown County Jail, repeatedly failed to take any action when inmates were identified as the highest possible suicide risk classification based on the Brown County Jail suicide risk assessment, and repeatedly failed to remove the shower curtain rods from the inmate showers despite four separate inmates dying from hanging themselves from the shower curtain rods within an 18 month period.

3.      Captain Larry Malcomson, the Jail Administrator for the Brown County Jail in 2016 and 2017, as well as other senior staff at the jail, were aware that the above failures were causing inmates in the Brown County Jail to die, and they failed to correct any of the above-identified failures.

4.      Jessica Jones, the director of nursing for Wellpath at the Brown County Jail in 2016 and 2017, as well as other senior staff at Wellpath, were aware that the above failures were causing inmates in the Brown County Jail to die, and they failed to correct any of the above-identified failures.

5.      This lawsuit seeks to establish that it is a violation of Christopher's constitutional rights for Brown County Jail staff to repeatedly fail to conduct medical and

mental health evaluations of incoming inmates within 14 days as required by Wisconsin law, categorically cut off inmates from their prescription psychotropic medications cold turkey upon being booked into the Brown County Jail, repeatedly fail to take any action when inmates were identified as the highest possible suicide risk classification based on the Brown County Jail suicide risk assessment, and repeatedly fail to remove the shower curtain rods from the inmate showers despite four separate inmates dying from hanging themselves from the shower curtain rods within an 18 month period. It seeks to ensure that Brown County Jail and Wellpath staff don't continue to fail to address the above problems so that a person who is suffering from a suicidal mental health crisis while in the custody of the Brown County Jail receives at least the minimum constitutionally required care instead of being repeatedly ignored, denied prescription medication, denied proper mental health treatment, and left alone unmonitored to commit suicide.

## JURISDICTION AND VENUE

6.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Christopher Champine's rights as secured by the United States Constitution.

7.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and the state law claims for indemnification pursuant to 28 U.S.C. § 1367.

8.     Venue is proper under 28 U.S.C. § 1391(b). Defendant Brown County is a political subdivision of the state of Wisconsin located within this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

9.      The Plaintiff, the Estate of Christopher A. Champine, is a legal entity with the capacity to sue and be sued.

10.      Richard Coad is the duly appointed Special Administrator of the Estate of Christopher A. Champine.

11.      Defendant Brown County is a political subdivision of the state of Wisconsin with a mailing address of 305 E. Walnut Street, Room #120, Green Bay, WI 54301. Pursuant to Wis. Stat. § 59.01, Brown County is authorized, inter alia, to sue and be sued. Brown County is a "person" for purposes of 42 U.S.C. § 1983. Brown County owns and operates the Brown County Jail. Acting through the Brown County Sheriff's Office, the County is responsible for training, supervising, and disciplining jail employees and contract staff working within the jail. Brown County is also responsible for adopting, implementing, and enforcing jail policies and practices, and ensuring that jail conditions and the medical treatment of detainees comply with the United States Constitution and other federal and state laws. Pursuant to Wis. Stat. § 59.27(1), Brown County acting through its Sheriff in his official capacity, cannot delegate away its constitutional duties regarding medical care for detainees. The County is liable for the jail policies, practices, and customs that caused the harm alleged, infra.

12.      Defendant Larry Malcomson was employed as the Jail Administrator for the Brown County Jail at the time of this occurrence. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine.

Case 1:23-cv-01392-WCG   Filed 12/13/23   Page 4 of 34   Document 16

Malcomson engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

13.     Defendant Scott Brisbane was at the time of this occurrence employed as a lieutenant for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Brisbane engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

14.     Defendant Heidi Michel was at the time of this occurrence employed as a lieutenant for the Brown County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Michel engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Brown County.

15.     Defendant John Mitchell was at the time of this occurrence employed as a lieutenant for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Mitchell engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

16.     Defendant Jamie Rhode was at the time of this occurrence employed as a lieutenant for the Brown County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Rhode engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Brown County.

17. Defendant Eric Frost was at the time of this occurrence employed as a lieutenant for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Frost engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

18. Defendant Michael Halasi was at the time of this occurrence employed as a lieutenant for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Halasi engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

19. Defendant Phillip Steffen was at the time of this occurrence employed as a lieutenant for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Steffen engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

20. Defendant Mona Vickman-King was at the time of this occurrence employed as a correctional officer for the Brown County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Vickman-King engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

21. Defendant Kurt Voster was at the time of this occurrence employed as a corporal for the Brown County Jail. In that role, he was responsible for the health, safety,

security, and welfare of detainees confined in the jail, including Champine. Voster engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

22. Defendant Al Krings was at the time of this occurrence employed as a corporal for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Krings engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

23. Defendant Rob Weed was at the time of this occurrence employed as a corporal for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Weed engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

24. Defendant Greg Engles was at the time of this occurrence employed as a corporal for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Engles engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

25. Defendant Kristy Jolly was at the time of this occurrence employed as a corporal for the Brown County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Jolly engaged

in the conduct complained of while she was on duty and in the course and scope of her employment with Brown County.

26.     Defendant Jeffrey Mekash was at the time of this occurrence employed as a corporal for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Mekash engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

27.     Defendant Zachary Bergh was at the time of this occurrence employed as a corporal for the Brown County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Champine. Bergh engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Brown County.

28.     Defendant Wellpath, LLC ("Wellpath"), f/k/a Correct Care Solutions, f/k/a Correctional Healthcare Companies, is a foreign for-profit corporation incorporated under the laws of the State of Delaware, doing business in the State of Wisconsin. Wellpath's principal office is located at 1283 Murfreesboro Road, Suite 500, Nashville, Tennessee 37217, and its Registered Agent is Corporate Creations Network, Inc., 4650 West Spencer Street, Appleton, Wisconsin 54914. As is relevant herein, Wellpath is a "person" for purposes of 42 U.S.C. § 1983. Following the incidents described herein, Correct Care Solutions ("CCS") and Correctional Healthcare Companies ("CHC") changed their name to Wellpath. Wellpath's acts and omissions at the Brown County Jail, including the acts and omissions of its employees and agents, were conducted under color of state law.

Wellpath is legally liable for all CCS/CHC policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Brown County Jail or elsewhere. Throughout this complaint, any reference to Wellpath should be understood to refer to Wellpath, CHC and CCS, the entities contracted to provide healthcare in the Brown County Jail and/or the entities who employees the individuals who were responsible for providing healthcare in the Brown County Jail.

29. Defendant Correct Care Solutions, LLC, ("CCS") is a foreign for-profit corporation doing business in the State of Wisconsin. CCS's principal office is located at 1283 Murfreesboro Road, Suite 500, Nashville, Tennessee 37217, and its Registered Agent is Corporate Creations Network, Inc., 4650 West Spencer Street, Appleton, Wisconsin 54914. As is relevant herein, CCS is a "person" for purposes of 42 U.S.C. § 1983. Following the incidents described herein, Correct Care Solutions ("CCS") changed its name to Wellpath. Upon information and belief, Wellpath is responsible for the assets and liabilities of CCS. CCS's acts and omissions at the Brown County Jail, including the acts and omissions of its employees and agents, were conducted under color of state law. Wellpath is legally liable for all CCS policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Brown County Jail or elsewhere.

30. Defendant Correctional Healthcare Companies, Inc., ("CHC") is a foreign for-profit corporation doing business in the State of Wisconsin. CHC's principal office is located at 1283 Murfreesboro Road, Suite 500, Nashville, Tennessee 37217, and its

Registered Agent is Corporate Creations Network, Inc., 4650 West Spencer Street, Appleton, Wisconsin 54914. As is relevant herein, CHC is a "person" for purposes of 42 U.S.C. § 1983. Following the incidents described herein, CHC changed its name to Wellpath. Upon information and belief, Wellpath is responsible for the assets and liabilities of CHC. CHC's acts and omissions at the Brown County Jail, including the acts and omissions of its employees and agents, were conducted under color of state law. Wellpath is legally liable for all CHC policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Brown County Jail or elsewhere.

31. Defendant Correctional Healthcare Companies, LLC., ("CHC") is a foreign for-profit corporation doing business in the State of Wisconsin. CHC's principal office is located at 1283 Murfreesboro Road, Suite 500, Nashville, Tennessee 37217, and its Registered Agent is Corporate Creations Network, Inc., 4650 West Spencer Street, Appleton, Wisconsin 54914. As is relevant herein, CHC is a "person" for purposes of 42 U.S.C. § 1983. Following the incidents described herein, CHC changed its name to Wellpath. Upon information and belief, Wellpath is responsible for the assets and liabilities of CHC. CHC's acts and omissions at the Brown County Jail, including the acts and omissions of its employees and agents, were conducted under color of state law. Wellpath is legally liable for all CHC policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Brown County Jail or elsewhere.

32.     Defendant Jean Short was at the time of this occurrence employed as Wellpath's jail operations manager for the Brown County Jail. Short was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Short engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

33.     Defendant Jessica Jones was at the time of this occurrence employed as the director of nursing for Wellpath at the Brown County Jail. Jones was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Jones engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

34.     Defendant Ava Gonzales was at the time of this occurrence employed as a registered nurse in the Brown County Jail. Gonzales was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Gonzales engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

35.     Defendant Amanda Zwiers was at the time of this occurrence employed as a LPN in the Brown County Jail. Zwiers was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Zwiers engaged in the conduct

complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

36. Defendant Diane Jensen was at the time of this occurrence employed as a registered nurse in the Brown County Jail. Jensen was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Jensen engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

37. Defendant Jamie Kuehn was at the time of this occurrence employed as a LPN in the Brown County Jail. Kuehn was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Kuehn engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

38. Defendant Emily Blozinski was at the time of this occurrence employed as a LPN in the Brown County Jail. Blozinski was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Blozinski engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

39. Defendant Jessica Denissen was at the time of this occurrence employed as a registered nurse in the Brown County Jail. Denissen was employed at the Brown County

Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Denissen engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

40.     Defendant LeeAnn Sullivan was at the time of this occurrence employed as a nurse in the Brown County Jail. Sullivan was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Sullivan engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

41.     Defendant Atalie Przybelski was at the time of this occurrence employed as a counselor in the Brown County Jail. Przybelski was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Przybelski engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

42.     Defendant Cynthia Dery was at the time of this occurrence employed as a counselor in the Brown County Jail. Dery was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Dery engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

43.     Defendant Megan Weber was at the time of this occurrence employed as a counselor in the Brown County Jail. Weber was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Weber engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

44.     Defendant Michelle Wilke was at the time of this occurrence employed as a counselor in the Brown County Jail. Wilke was employed at the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Wilke engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

45.     Defendant Synthia Peterson was at the time of this occurrence employed as Wellpath's regional manager for the Brown County Jail. Peterson was employed as a regional manager for the Brown County Jail as a contractor through Wellpath. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Champine. Peterson engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Brown County Jail through Wellpath.

46.     Defendant Dr. Adeyemi Fatoki was at the time of this occurrence employed by Wellpath as a doctor in the Brown County Jail. Fatoki was employed at the Brown County Jail as a contractor through Wellpath. In that role, he was responsible for the health and welfare of detainees confined in the jail, including Champine. Fatoki engaged in the

conduct complained of while he was on duty and the course and scope of his employment at the Brown County Jail through Wellpath.

47.     Defendant Dr. Babatunde Okuleye was at the time of this occurrence employed by Wellpath as a doctor in the Brown County Jail. Okuleye was employed at the Brown County Jail as a contractor through Wellpath. In that role, he was responsible for the health and welfare of detainees confined in the jail, including Champine. Okuleye engaged in the conduct complained of while he was on duty and the course and scope of his employment at the Brown County Jail through Wellpath.

**FACTS**

48.     Plaintiff realleges the above paragraphs.

49.     In 2016 and 2017, the Brown County Jail contracted with a private for-profit correctional healthcare company called Correct Care Solutions, LLC, which was subsequently renamed Wellpath, LLC, to provide medical and mental health care to inmates in the Brown County Jail.

50.     The Brown County Jail took Christopher into legal and physical custody as a pre-trial detainee, thereby establishing a special custodial and supervisory relationship toward him by Brown County to provide necessary medical care. Brown County contractually delegated and shared this duty with Wellpath. This special custodial and supervisory relationship consequently gave rise to affirmative contractual legal duties by Wellpath and its employees, agents, and contractors to secure Christopher's liberty interests and rights, including his physical safety, essential medical care and treatment, and his right to be free from unnecessary pain and suffering, substantive rights protected by

the Fourteenth and Eighth Amendments to the U.S. Constitution – rights which Brown County and Wellpath violated.

51.     In 2016 and 2017, Wellpath categorically cut off inmates from their prescription psychotropic medications cold turkey upon being booked into the Brown County Jail, and even when the inmates themselves or their family members brought their prescription psychotropic medications to the jail, Wellpath refused to allow the inmates to take their prescription psychotropic medications.

52.     In 2016 and 2017, Wellpath categorically failed to complete initial Medical History and Health Assessments of inmates within 14 days of their booking into the Brown County Jail as required by Wisconsin Administrative Code 350.13(5).

53.     The above-named Brown County Jail staff and the above-named Wellpath staff knew that it was a Brown County Jail practice and Wellpath practice to cut off inmates cold turkey from their psychotropic medications that they were taking prior to booking into the jail.

54.     The above-named Brown County Jail staff and the above-named Wellpath staff knew that it was a Brown County Jail practice and Wellpath practice to cut off inmates cold turkey from their psychotropic medications that they were taking prior to booking into the jail without consulting with any doctor prior to doing so.

55.     The above-named Brown County Jail staff and the above-named Wellpath staff knew that it was a Brown County Jail practice and Wellpath practice to cut off inmates cold turkey from their psychotropic medications that they were taking prior to booking into the jail without any doctor providing a medical justification for doing so.

56. The above-named Brown County Jail staff and the above-named Wellpath staff knew that it was a Brown County Jail practice and Wellpath practice to cut off inmates cold turkey from their psychotropic medications that they were taking prior to booking into the jail and that the practice led to catastrophic outcomes such as pain, suffering and suicides, but did nothing to stop that common practice at the Brown County Jail.

57. The above-named Brown County Jail staff and the above-named Wellpath staff knew that the existing medical healthcare and mental healthcare staffing at the jail was insufficient to adequately address the medical and mental healthcare needs of the inmates but failed to correct the problem because of the cost associated with providing the necessary level of medical healthcare and mental healthcare staffing at the jail.

58. The above-named Brown County Jail staff and the above-named Wellpath staff knew that inmates at the jail had been repeatedly committing suicide by hanging themselves from the shower curtain rods at the jail but failed to remove the shower curtain rods or prevent suicidal inmates from unsupervised access to the shower curtain rods where they could hang themselves.

59. Defendants Larry Malcomson, Scott Brisbane, John Mitchell, Heidi Michel, Eric Frost, Michael Halasi, Phillip Steffen, and Jamie Rhode and other Brown County Jail staff were all involved in a months-long email conversation in 2016 and early 2017 about the need to remove the shower curtain rods from the jail showers because of the ongoing deaths in the jail resulting from inmates hanging themselves from the shower curtain rods.

60. On June 22, 2017, Defendants Jessica Jones, Atalie Przybelski, John Mitchell, Scott Brisbane, Larry Malcomson, and Jean Short participated in a meeting and discussed

the need to remove and replace the shower curtain rods because they were being used by the inmates to commit suicide.

*Tonya Mealman Died from Hanging Herself from The Shower Curtain Rod In 2016*

61. On July 18, 2016, Tonya K. Mealman died from hanging herself from the shower curtain rod while in custody at the Brown County Jail.

62. Tonya Mealman had previously attempted to hang herself from the shower curtain rod while in custody at the Brown County Jail, but the two socks that she tied together and used to hang herself from the shower curtain rod broke and she fell and cut her head on the floor. She was found "lying in a large puddle of blood and moaning loudly" and taken by ambulance to the hospital to get her head stapled back together.

63. When Tonya was booked into the jail, on June 27, 2016, the Brown County Jail suicide risk assessment identified her as the highest possible suicide risk classification. She reported she had attempted suicide before, was being treated for her mental health, and was currently taking psychotropic prescription medications for depression and bi-polar disorder.

64. The day after Tonya was booked into the jail, her family dropped off her psychotropic prescription medication, but the jail medical staff refused to give any of her medications to her.

65. Other inmates at the Brown County Jail told jail and medical staff that Tonya was sick and not eating, that that Tonya had been making herself throw up and needed help, that they thought that Tonya was suicidal, that Tonya needed her medication, and that Tonya said that she was thinking of killing herself.

66. The Brown County Jail staff, including the medical staff, both ignored Tonya's calls for help and her fellow inmates' calls to help Tonya.

67. In the weeks before her death, Tonya had been asking for the medication she had been prescribed before she was booked into the jail, and she wrote notes to jail and/or medical staff asking for her medication and saying that she needed to see psychiatric doctor ASAP, however the staff at the jail didn't follow up on her request for weeks.

68. After Tonya's suicide the Brown County Jail conducted a Mortality Review (an interdisciplinary committee process comprised of correctional, medical, and mental health personnel that examines the events surrounding the death to determine if the incident was preventable and to make recommendations aimed at reducing the opportunity of future deaths). During the Mortality Review Atalie Przybelski recommended that the shower curtain rods be removed so that individuals could not hang themselves from the shower curtain rods.

69. The Brown County Jail administration did nothing to change the shower curtain rods after Tonya Mealman was found hanging from the shower curtain rod in 2016. As a result of leaving the current shower curtain rods in place, Eric Thompson was able to hang himself from the shower curtain rod in 2016, Michael Boncher was able to hang himself from the shower curtain rod in 2017, and Christopher Champine was able to hang himself from the shower curtain rod in 2017.

*Eric Thompson Died from Hanging Himself from The Shower Curtain Rod In 2016*

70. On December 12, 2016, Eric A. Thompson died from hanging himself from the shower curtain rod while in custody at the Brown County Jail.

71.     When Eric was booked into the jail, on December 7, 2016, the Brown County Jail suicide risk assessment identified him as the highest possible suicide risk classification. He threatened to kill himself while he was being transported to the jail and when he arrived at the jail for the booking process, it was noted that he had staples in his leg from a recent suicide attempt by using a knife approximately one week earlier. He reported to the booking officer that he was being treated for his mental health and was taking psychotropic prescription medications for depression and anxiety.

72.     The Wellpath staff did not give Thompson any of his prescription psychotropic medications that he was taking for his depression and anxiety.

73.     After Eric's suicide, the Brown County Jail conducted a Mortality Review (an interdisciplinary committee process comprised of correctional, medical, and mental health personnel that examines the events surrounding the death to determine if the incident was preventable and to make recommendations aimed at reducing the opportunity of future deaths). The Mortality Review only had one recommendation to prevent future suicides: "removing shower curtain rods."

74.     Also during the Mortality Review of Eric Thompson, Atalie Przybelski again renewed her same recommendation from Tonya Mealman's Mortality Review—that the shower curtain rods be removed so that individuals could not hang themselves from the shower curtain rods.

75.     After Eric's suicide, the Wisconsin Department of Corrections Office of Detention Facilities conducted an Administrative Review of the Brown County Jail and made a written recommendation to the jail that "Administration should review the shower

areas of the facility and consider removal of the current bars and replace with curtains that will not support weight and do not obstruct a full view into the shower area so that feet can be observed."

76. After Eric's suicide, on June 22, 2017, in a meeting among Wellpath staff members Jean Short, Jessica Jones, and Atalie Przybelski and Brown County Jail staff members Lt. John Mitchell, Lt. Scott Brisbane, Cpl. Brian Laurent, and Capt. Larry Malcomson, the issue of the shower curtain rods needing to be replaced to prevent future suicides was again discussed with the following notation in the meeting minutes "[b]eing researched for ideas of purchase."

77. Nancy Thelen, the Wisconsin Department of Corrections Inspector of Detention Facilities, reviewed the death of Eric Thompson at the Brown County Jail and sent an email to Brown County Jail Lieutenant Shane Timreck stating the "incident was reviewed by the Jail Admin, CCS team, and MHP staff. I have suggested the removal of shower curtain bars and installing a different type of curtain device. This has not occurred yet."

78. The Brown County Jail administration did nothing to change the shower curtain rods after Tonya Mealman was found hanging from the shower curtain rod in 2016, or after Eric Thompson was found hanging from the shower curtain rod in 2016. As a result of leaving the current shower curtain rods in place, Michael Boncher was able to hang himself from the shower curtain rod in 2017 and Christopher Champine was able to hang himself from the shower curtain rod in 2017.

*Michael Boncher Died from Hanging Himself from The Shower Curtain Rod In 2017*

79.     On October 20, 2017, Michael T. Boncher died from hanging himself from the shower curtain rod while in custody at the Brown County Jail.

80.     Boncher was a pre-trial detainee at the jail and was being held at the jail because he could not afford to pay a $10,000 cash bond to be released.

81.     Prior to being booked into the jail, on October 15, 2017, the police took Boncher to Brown County Health and Human Services to be evaluated because he told them that he was suicidal.

82.     When Boncher was booked into the jail, on October 15, 2017, the Brown County Jail staff identified him as a suicide risk. He reported to the booking officer that he was suicidal and that he didn't think that he could keep himself safe while in jail, that he was being treated for his mental health issues and receiving psychiatric care, and that he was taking psychotropic prescription medications for depression, bipolar disorder, and anxiety.

83.     Boncher was placed on suicide watch for less than 24 hours on October 15, 2017, after booking into the jail.

84.     Defendants Michel, Frost, Halasi, and Rhode were specifically aware that Boncher was suicidal because each of these individuals worked as one of the shift lieutenants in charge at the Brown County Jail between October 15, 2017, the date that Boncher booked into the jail and October 20, 2017, the date that Boncher was found dead in the jail.

85. On October 15, 2017, Defendant Jessica Dennisen asked Boncher what his current medications were and noted "effexor, omeprazole, albuterol – more no names" but she didn't do anything to follow up and identify the unknown medications or to ensure that Boncher was able to continue taking his psychotropic medications while in jail.

86. Department of Corrections Administrative Code § 350.18 requires that county jails have policies and procedures relating to jail security, and specifically requires jails to have a system in place to ensure that every inmate is personally observed by jail security staff at staggered intervals of 60 minutes or less (and at intervals of 15 minutes or less for inmates on suicide watch), and that each inmate walk through inspection be documented.

87. The above-named Brown County staff were responsible for ensuring that an officer personally observed Boncher every 15 minutes while he was on suicide watch, however that did not occur.

88. Less than 24 hours after being booked into the jail and informing jail staff that he was suicidal and that he didn't think he could keep himself safe, Defendant Megan Weber evaluated Boncher and recommended that he be taken off suicide watch.

89. Aside from the less than 24 hours of suicide watch upon being booked into the jail and following their alcohol withdrawal protocol and opiate withdrawal protocol, neither the above-named Brown County Jail staff or the above-named Wellpath staff did anything to specifically monitor or check in with Boncher regarding his known suicidal risk and known suicidal ideation.

90.     On October 17, 2017, Boncher submitted a written request to the Wellpath staff asking them to give him a release to sign so that they could get his healthcare records from Dr. Serverance at Prevea Howard Health.

91.     The above-named Wellpath staff didn't send a release requesting Boncher's healthcare records from Dr. Serverance at Prevea Howard Health until October 19, 2017.

92.     Wellpath staff noted that they did not review Boncher's healthcare records from Dr. Serverance at Prevea Howard Health until November 9, 2017, which was 20 days after he was found dead in the jail.

93.     On October 20, 2017, correctional officer Eric Wrolstad was responsible for completing the inmate walk-through inspections of the Alpha block of the jail during the first shift (7:00 a.m.–3:00 p.m.).

94.     On October 20, 2017, Wrolstad, who was the correctional officer watching the inmates in the Alpha pod where Boncher was residing, entered a notation that he conducted an inmate check or walk-through of the pod at 10:04 a.m. and wrote, "walk thru ok."

95.     On October 20, 2017, at 10:04 a.m., Wrolstad did not observe Boncher, as he was hanging from a shower curtain rod at that time, in a shower stall located about 15 feet from where Wrolstad was sitting.

96.     The above-named Wellpath staff never gave Boncher any of his prescription psychotropic medications that he was taking for his depression, bipolar disorder, and anxiety disorder.

97. The above-named Wellpath staff knew that Boncher was suicidal and that he had been placed on suicide watch because he said that he was suicidal and that he would not be able to keep himself safe, and they either failed to communicate this information to Dr. Fatoki, or they did communicate this information to Dr. Fatoki and Dr. Fatoki failed to take any action to evaluate Boncher, get Boncher psychiatric help, or take any steps to ensure that he was able to continue receiving the psychotropic medication that he was taking prior to booking into jail.

98. The above-named Wellpath staff knew that Boncher was taking psychotropic medication for his depression, bipolar disorder, and anxiety prior to booking into the jail and either failed to communicate this information to Dr. Fatoki, or they did communicate this information to Dr. Fatoki and Dr. Fatoki failed to continue Boncher's psychotropic medication without documenting any medical reason for doing so.

99. Boncher's outside medical records that Wellpath received indicated that he was prescribed 225 MG of Effexor / Venlafaxine each day.

100. When Boncher was booked into the Brown County Jail on October 15, 2017, he told jail staff that he was taking the prescription medication Effexor (and that he "doesn't know the names of the rest them") from Dr. Serverance at Prevea Howard Health and that he was filling his prescriptions at the CVS pharmacy in Howard, WI.

101. One of the serious side effects of cutting someone off cold turkey from an Effexor / venlafaxine prescription is suicidal ideation.

102. To treat Boncher's alcohol withdrawal, Dr. Adeyemi Fatoki prescribed him Librium / chlordiazepoxide without properly evaluating Boncher's medical and mental

health history of liver disease and depression, and the above-named Wellpath staff gave Boncher Librium / chlordiazepoxide without obtaining his informed consent or making him aware that one of the possible side effects of taking chlordiazepoxide is suicidal ideation.

103.     The above-named Brown County Jail staff and the above-named Wellpath staff who were working at the jail between October 15, 2017, and October 18, 2017, observed or learned that Boncher was going through alcohol withdrawal and that Boncher was sweating and nauseous or vomiting.

104.     Like Tonya Mealman, Boncher had previously attempted to commit suicide by hanging himself while he was in the Brown County Jail.

105.     The Brown County Jail administration did not remove the shower curtain rods after Tonya Mealman was found hanging from the shower curtain rod in 2016, or after Eric Thompson was found hanging from the shower curtain rod in 2016, or after Michael Boncher was found hanging from the shower curtain rod in 2017. As a result of leaving the current shower curtain rods in place, Christopher Champine was able to hang himself from the shower curtain rod in 2017.

106.     On November 17, 2017, Mike Pickett sent an email to Scott Brisbane and Larry Malcomson, the Jail Administrator for the Brown County Jail in 2016 and 2017. In that email, Mike Pickett wrote, "It has come to my attention from Tom Hermes that shower curtain modification has become a high priority in the direct supervision pods since the suicide incident. … The cost of the complete setup from Grainger for one shower is $150.79

which includes the vented curtain Grainger number 36FW89, Four hanger straps Grainger 36FX13, and the track Grainger 36FX06."

*Christopher Champine Died from Hanging Himself from The Shower Curtain Rod In 2017*

107. On December 16, 2017, Christopher A. Champine died from hanging himself from the shower curtain rod while in custody at the Brown County Jail.

108. Champine was booked into the Brown County Jail on June 23, 2017, and was being held as a pre-trial detainee.

109. Champine had been booked into the Brown County Jail three months earlier on March 20, 2017, during which time he reported to jail booking staff that he was currently being treated for mental health issues and was taking medication for his PTSD and bipolar disorder.

110. On July 18, 2017, Champine wrote to the Wellpath HSU stating "May I please get my medication for my Bipolar & ptsd. It is called Quetiapine. My pharmacy is Wallgreens on cardinal ln. in Howard WI." And Wellpath HSU responded two days later stating "Where were you being treated prior to jail? You did not report any mental health issues or meds @ booking." Champine wrote back "I was being treated at Aurora behavioral health in green Bay by Dr Susan Tran."

111. On August 4, 2017, Champine wrote to the Wellpath HSU stating "May I please get my medication for my Bi-Polar and PTSD. Its been almost 2 months. I signed a medical record release for HSU over 2 weeks ago." And Wellpath HSU responded four days later stating "you are on the list to see the MHP [mental health professional]."

112.   On August 2, 2017, 40 days after being booked into the jail, Defendant Nurse Zwiers conducted a mental health screening of Champine and noted that he has a history of or currently taking the psychotropic medication Quetiapine (Seroquel) and that he has a history of outpatient mental health treatment at Aurora. Dr. Fatoki reviewed and signed this document on August 3, 2017, but did not document any clinical reason for the denial and did not provide him with any alternative treatment.

113.   On August 12, 2017, Champine's family brought his Quetiapine (Seroquel) medication to the jail. Wellpath staff called Dr. Okuleye to get permission to Champine to take his Quetiapine (Seroquel) prescriptions. Dr. Okuleye ordered that Champine should not be allowed to take his Quetiapine (Seroquel) prescription medication but did not document any clinical reason for the denial and did not provide him with any alternative treatment.

114.   On August 15, 2017, Champine told jail staff that he needed to see someone about his mental health problems. Wellpath Defendant Dery met with Champine and stated that Wellpath mental health would follow up with him as needed.

115.   On August 16, 2017, Wellpath Defendant Dery conducted an initial behavioral health evaluation of Champine. During this evaluation Champine told Wellpath staff that he was experiencing anxiety and symptoms of PTSD, that he is not sleeping and experiencing flashbacks, that prior to jail he was receiving mental health treatment from Dr. Tran at Aurora, that he was on psychotropic medication for his bipolar and PTSD. Defendant Dery checked the box to refer Champine to see the psychiatric provider, but that appointment was never made.

116.    On August 16, 2017, Wellpath staff received Champine's outside medical records from Aurora Health Care documenting that he had been regularly seeing his doctor prior to booking into jail, that he had significant psychiatric disorders, and that his doctor had recently quadrupled his Quetiapine (Seroquel) prescription to 400 mg per day for his manic depression, that he was also taking the psychotropic medication Abilify, and that he had been diagnosed with bi-polar disorder, excessive anxiety, panic disorder, PTSD, and social phobia.

117.    On Friday, December 15, 2017, the jail Chaplain Karen Konrad met with Champine and was so concerned about his mental health that she notified Corporal Kurt Voster, Al Krings, Rob Weed, Greg Engles, Kristy Jolly, Jeffrey Mekash, or Zachary Bergh and left a voice message for Wellpath mental health staff. The jail staff did nothing in response to her concerns. Defendant Przybelski noted that she received the voice message on Monday, December 18, 2017, but that Champine was already dead.

118.    The following morning, after the Chaplain told officers she was concerned about Champine's mental health, at approximately 9:42 a.m., an inmate found Champine hanging from a shirt sleeve tied to the shower curtain rod.

119.    Jail video footage shows Champine entering the shower with his clothes on at 8:16 a.m.

120.    Correctional officer Defendant Mona Vickman-King had been working since 11:00 p.m. the night before and was required by law to conduct inmate checks and personally observe and record her inmates checks at staggered intervals of 60 minutes or

less. Defendant Vickman-King wrote in the log report that she conducted an inmate check at 8:57 a.m. and that she observed all 46 of 46 inmates.

121.    At 8:57 a.m. when Defendant Vickman-King reported that she conducted an inmate check and personally observed Champine, he was actually hanging in the shower.

122.    The above-named Wellpath staff knew that Champine was taking psychotropic medication for his bi-polar disorder, excessive anxiety, panic disorder, PTSD, and social phobia prior to booking into the jail and either failed to communicate this information to either Dr. Fatoki or Dr. Okuleye, or they did communicate this information to Dr. Fatoki or Dr. Okuleye and Dr. Fatoki or Dr. Okuleye failed to continue Champine's psychotropic medication without documenting any medical reason for doing so or providing any alternative treatment.

## COUNT 1:

## 42 U.S.C. § 1983 Claim for deprivation of due process by deliberate indifference against individual Defendants

123.    Plaintiff realleges the above paragraphs.

124.    Champine, at all times relevant to this complaint, was a pretrial detainee.

125.    Defendants Larry Malcomson, Scott Brisbane, Heidi Michel, John Mitchell, Jamie Rhode, Eric Frost, Michael Halasi, Phillip Steffen, Mona Vickman-King, Kurt Voster, Al Krings, Rob Weed, Greg Engles, Kristy Jolly, Jeffrey Mekash, Zachary Bergh, Jean Short, Jessica Jones, Ava Gonzales, Amanda Zwiers, Diane Jensen, Jamie Kuehn, Emily Blozinski, Jessica Denissen, LeeAnn Sullivan, Atalie Przybelski, Cynthia Dery, Megan Weber, Michelle Wilke, Synthia Peterson, Babatunde Okuleye, and Adeyemi Fatoki were

subjectively and objectively, deliberately indifferent to Champine's serious medical condition of being suicidal.

126. There was a strong likelihood that Champine would commit suicide.

127. Defendants Larry Malcomson, Scott Brisbane, Heidi Michel, John Mitchell, Jamie Rhode, Eric Frost, Michael Halasi, Phillip Steffen, Mona Vickman-King, Kurt Voster, Al Krings, Rob Weed, Greg Engles, Kristy Jolly, Jeffrey Mekash, Zachary Bergh, Jean Short, Jessica Jones, Ava Gonzales, Amanda Zwiers, Diane Jensen, Jamie Kuehn, Emily Blozinski, Jessica Denissen, LeeAnn Sullivan, Atalie Przybelski, Cynthia Dery, Megan Weber, Michelle Wilke, Synthia Peterson, Babatunde Okuleye, and Adeyemi Fatoki knew of that strong likelihood or strongly suspected the likelihood existed.

128. The conduct of each of the Defendants Larry Malcomson, Scott Brisbane, Heidi Michel, John Mitchell, Jamie Rhode, Eric Frost, Michael Halasi, Phillip Steffen, Mona Vickman-King, Kurt Voster, Al Krings, Rob Weed, Greg Engles, Kristy Jolly, Jeffrey Mekash, Zachary Bergh, Jean Short, Jessica Jones, Ava Gonzales, Amanda Zwiers, Diane Jensen, Jamie Kuehn, Emily Blozinski, Jessica Denissen, LeeAnn Sullivan, Atalie Przybelski, Cynthia Dery, Megan Weber, Michelle Wilke, Synthia Peterson, Babatunde Okuleye, and Adeyemi Fatoki, given their knowledge or strong suspicions, were objectively unreasonable and caused Champine's injuries.

129. Had Defendants Larry Malcomson, Scott Brisbane, Heidi Michel, John Mitchell, Jamie Rhode, Eric Frost, Michael Halasi, Phillip Steffen, Mona Vickman-King, Kurt Voster, Al Krings, Rob Weed, Greg Engles, Kristy Jolly, Jeffrey Mekash, Zachary Bergh, Jean Short, Jessica Jones, Ava Gonzales, Amanda Zwiers, Diane Jensen, Jamie

Kuehn, Emily Blozinski, Jessica Denissen, LeeAnn Sullivan, Atalie Przybelski, Cynthia Dery, Megan Weber, Michelle Wilke, Synthia Peterson, Babatunde Okuleye, and Adeyemi Fatoki not acted in a manner that was objectively unreasonable, Champine would not have hanged himself in the jail.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Larry Malcomson, Scott Brisbane, Heidi Michel, John Mitchell, Jamie Rhode, Eric Frost, Michael Halasi, Phillip Steffen, Mona Vickman-King, Kurt Voster, Al Krings, Rob Weed, Greg Engles, Kristy Jolly, Jeffrey Mekash, Zachary Bergh, Jean Short, Jessica Jones, Ava Gonzales, Amanda Zwiers, Diane Jensen, Jamie Kuehn, Emily Blozinski, Jessica Denissen, LeeAnn Sullivan, Atalie Przybelski, Cynthia Dery, Megan Weber, Michelle Wilke, Synthia Peterson, Babatunde Okuleye, and Adeyemi Fatoki, and because they acted maliciously, wantonly, or oppressively, punitive damages, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 2:

### 42 U.S.C. § 1983 *Monell*[1] claim against Defendant Brown County and
### Wellpath/CHC/CCS

130.    Plaintiff realleges the above paragraphs.

131.    Defendant Brown County and Wellpath/CHC/CCS authorized, tolerated, ratified, permitted, or acquiesced in policies, practices, and customs, oral and written, pronounced, and *de facto*, including detainee medical decisions made irrespective of

---

[1] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

Case 1:23-cv-01392-WCG   Filed 12/13/23   Page 32 of 34   Document 16

appropriate medical judgment, which were objectively unreasonable and exhibited substantial departure from accepted professional judgment, practices, and/or standards, and which were also deliberately indifferent to the safety and suffering of detainees with serious medical conditions, including Champine in violation of his rights protected by the Fourteenth Amendment to the United States Constitution. These policies, practices, and customs were the moving force which caused the deprivation of Plaintiff's constitutional rights.

132.   Defendant Brown County and Wellpath/CHC/CCS failed to have a policy, custom, or practice in place to adequately monitor inmates were identified as the highest possible suicide risk classification based on the Brown County Jail suicide risk assessment.

133.   Defendant Brown County and Wellpath/CHC/CCS knew that their policy, custom, or practice of categorically cutting off inmates from their prescription psychotropic medications cold turkey when they booked into the Brown County Jail and without providing them with any alternative medication or mental health treatment resulted in unnecessary pain, suffering and death of inmates at the Brown County Jail.

134.   Defendant Brown County and Wellpath/CHC/CCS knew that their policy, custom, or practice of categorically failing to complete initial Medical History and Health Assessments of inmates within 14 days of their booking into the Brown County Jail as required by Wisconsin Administrative Code 350.13(5), resulted in unnecessary pain, suffering and death of inmates at the Brown County Jail.

135.   Defendant Brown County and Wellpath/CHC/CCS failed to adequately train and supervise their employees.

136.    Defendant Brown County and Wellpath/CHC/CCS's policies, customs, practices, training, and supervision of employees, or lack thereof was a direct cause or moving force that caused the deprivation of Plaintiff's constitutional rights.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendant Brown County and Wellpath/CHC/CCS, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## JURY DEMAND

137.    Plaintiff hereby demands a trial by jury, pursuant to FED. R. CIV. PRO. 38(b), on all issues so triable.


Respectfully submitted,

Dated: 13 December 2023,

/s/ John H. Bradley
John H. Bradley
  Wisconsin Bar No. 1053124
R. Rick Resch
  Wisconsin Bar No. 1117722
James Odell
  Wisconsin Bar No. 1131587
STRANG BRADLEY, LLC
613 Williamson Street, Suite 204
Madison, Wisconsin 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com
James@StrangBradley.com

Attorneys for Plaintiff